IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 24 CR 1 |
| v. | ) | |
| | ) | Judge Martha M. Pacold |
| NICOLAS STISO | ) | |

## DEFENDANT STISO'S SENTENCING MEMORANDUM

Defendant NICOLAS STISO, by the Federal Defender Program and its attorney, DANIEL HESLER, respectfully submits the following memorandum concerning relevant sentencing factors. Mr. Stiso's conduct was unacceptable, but Mr. Stiso's mental health issues, as well as the context of the threats, mitigate the offenses to a significant degree. The defendant further states as follows:

**I.      Background**

In 2023, Nicolas Stiso was struggling with several issues individually and in combination. He has mental health issues, he has a history of homelessness, he was suffering from grief, and he was using drugs. On the positive side, he was housed, in that he had an apartment that he had obtained with the assistance of the VA. He also had kept steady employment at a submarine sandwich shop continuously since 2021. But emotionally and psychologically he was a mess. He was unhappy with the level of help he was (or was not) getting from the VA; he felt that the apartment was in a building that was unsafe. He was also unhappy with the police officers who had

1

investigated the death of his former girlfriend, who had overdosed in 2022. Mr. Stiso believes he knew who had sold her the drugs that had killed her, and was frustrated that the detectives would not act on that information.

None of these circumstances justify what Mr. Stiso said in a series of phone calls in late December of 2023. On December 21 and 24, exactly as described in the indictment and plea agreement in this case, Nicolas Stiso called the "Veteran's Crisis Line." This is a hotline for veterans and their families. In each call, he accurately reported his name and his identifying numbers, and made no attempt to conceal where he was calling from.

Although there is no justification for the kinds of threats Mr. Stiso made, the circumstances of these calls, along with Mr. Stiso's innate characteristics and his particular emotional and mental state in December of 2023, will be discussed as §3553 considerations.

## II. The applicable sentencing guidelines

After some consideration, the defense agrees with the guidelines as calculated in the PSR. That being said, the defense suggests that this is not a case where the guidelines should be a dominant consideration. This case involves a mentally ill veteran calling up the VA Crisis Hotline and saying unacceptable things. No matter how the guidelines calculations end up, that will remain the situation here. No factual disputes are apparent. Regardless of the ultimate guidelines range, the defense

suggests that Mr. Stiso should not be incarcerated longer than is necessary to get him in a position to be released with appropriate support.

With respect to the guidelines, however, the following summarizes the guidelines possibilities:

**Count 1 (the offense of conviction, from December 21, 2023)**

| | |
|---|---|
| Base offense level   (from §2A6.1(a)(1)) | 12 |
| More than 1 threat made (§2A6.1(b)(2)) | + 2 ? |
| Official victim (§3A1.2(a)) | + 3 ? |
| **Subtotal offense level** | **15 or 17** |

**Count 2 (the stipulated offense, from December 24, 2023)**

| | |
|---|---|
| Base offense level   (from §2A6.1(a)(1)) | 12 |
| More than 1 threat made (§2A6.1(b)(2)) | + 2 ? |
| Official victim (§3A1.2(a)) | + 3 ? |
| **Subtotal offense level** | **15 or 17** |
| **Grouping issue (§3D1.2 & §3D1.4** | **+ 2 (or not)** |

(Either Count 1 and the stipulated offense group,
in which case there is no increase under the grouping rules,
or they do not group, in which case 2 levels would be added
to the group with the highest offense level.)

| | |
|---|---|
| **Acceptance** | **- 3** |
| **Likely Total Offense Levels** | **14 or 16** |

**Resulting Guideline Ranges, at Criminal History Category II:**
   At level 13:   15 - 21 months (from plea agreement)
   At level 14:   18 - 24 months (PSR and defense position)
   At level 16:   24 - 30 months (government position)

3

**A.     Although Mr. Stiso made multiple threats to multiple victims, those should not result in two separate increases to his offense level.**

There is no dispute that Mr. Stiso made a number of phone calls over the span of a few days in which he made threatening statements. In the plea agreement, the government took the position that Mr. Stiso should get two separate enhancements for that conduct. See ECF #51 at 4-5. The first enhancement is under §2A6.1(b)(2)(A), which adds two levels when a defendant makes more than two threats. The second enhancement is under the grouping rules. Under USSG §3D, if counts involve substantially the same harm, they are deemed to group together. See §3D1.2. Otherwise, separate counts result in an incremental increase to the offense level of the count with the highest offense level. See §3D1.4.

The PSR sensibly concludes that only one of those enhancements applies. According to the PSR, the calls from December 21 and December 24, 2023, each constitute a threatening communication. See PSR at 9. As such, the PSR assigns Mr. Stiso a 2-level increase under the grouping rules, but does not apply the §2A6.1(b)(2)(A) enhancement for multiple threats within the calls.

The defense's position is that under the facts of this particular case, there should either not be two separate enhancements, or if there are, should be offset by a two-level guidelines departure based on overrepresentation of the offense conduct within the guidelines. The defense is agnostic as to which 2-level enhancement should apply. The key fact is this; no matter how many calls Mr. Stiso made, or how

4

many potential victims he named, he dialed one phone number. Admittedly, he kept calling that number, and that is an aggravating consideration. As a result, one 2-level increase (either way) does makes sense. But essentially, Mr. Stiso starting calling the VA Crisis Hotline, and kept calling it and saying increasingly outrageous things until he got a reaction. He really was in crisis, and he wanted help. And simply calling his social worker did not seem (to him) to be doing anything. It is the defense's position that no matter what the guidelines say, for Mr. Stiso these calls were actually part of a single course of conduct.[1] That was true despite the fact that he threatened multiple people, and would have still been true if he had opened the phone book and said "I am also going to kill the following people: Adams, Agee, Amster, Anderson, …."

Finally, the government's recently filed sentencing memorandum argues for both enhancements in a way that does not necessarily support their conclusion. The government does not agree with the PSR that multiple threats contained in the same phone call are essentially one threat. ECF #51 at 4-5. The government also points out that Mr. Stiso also made threatening statements on December 19 in a call that said "… I'm about to pop and be physically violent at your hospital grounds." *Id.* at 5. The defense does not contest that that statement was made, and agrees that such statements are also not good. However, the government argues that those threats are

---

[1] Arguably, this is related to the idea that all these calls, and all these threats, seemed designed to get him some attention from the VA. But that will be discussed more fully as a §3553 consideration below.

5

relevant conduct to the other threats, despite the fact that they are threats to a different set of victims. If the government were correct that threats made to different victims can be relevant conduct, then why are the threats outlined in count one and the stipulated conduct being treated as non-groupable conduct resulting in an additional two levels under §3D? If threats made concerning different victims on a different day can be relevant conduct, then all of this conduct should group together, and the two levels under the grouping rules should not apply. See §3D1.2. Conversely, if threats made concerning different victims on different days cannot be relevant conduct and therefore cannot group, then the December 19 conduct, albeit a valid aggravating consideration under §3553, cannot factor into the calculation of the number of threats made on the other counts.

 The defense will accept will accept this Court's ruling however it comes out. It remains the defense contention that this should be more of a §3553 case than a guidelines case. If Mr. Stiso's criminal conduct is thought of as a pie, the number of slices it is divided into should not be a dispositive factor as to the ultimate sentence.

**B. The "official victim" enhancement under §3A1.2 does apply.**

 The PSR applies a 3-level enhancement for an offense committed against a victim who is a government officer or employee. PSR at 8-10. This enhancement was not contemplated by the parties in the plea agreement. Nevertheless, after some reflection, the defense agrees that this enhancement is applicable.

If there is any mitigation with respect to this enhancement, it would be to point out two things. One is that none of these threats were made by Mr. Stiso directly to the victims themselves. The other is that by making these threats over the VA crisis line, it is apparent that these threats may have had more to do with the fact that Mr. Stiso was trying to get help than trying to place these victims in fear. That does not excuse his conduct, but it may mitigate it slightly.

### III. The §3553 factors in this case

#### A. The legal framework for sentencing

This Court is well aware of the post-*Booker* framework for sentencing. Under 18 U.S.C. §3553, this Court is required to impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes [of sentencing] …." The question, as always, is what sentence will be sufficient in Ms. Brown's individual case.

#### B. Some observations about the situation.

A discussion of the right sentence in this case necessarily starts with some acknowledgments. One, making threats is bad. Making threats over means of interstate commerce is illegal, and there are good reasons why such laws exist. Threatening statements have an effect on those threatened, and the voicing of threats can be a precursor to actual violence by the person making the threats, as well as potentially triggering violent responses from the persons threatened. Society is

therefore better off if people do not threaten each other. At the same time, there is some tension between our society's long-held tradition of free speech and the limitations placed on speech by statutes that criminalize threatening communications. Apart from the legalities,[2] there has long been a social norm that says that restraint is a virtue, and that unrestrained expressions of anger are a sign of weakness. There are more recent cultural currents going the other direction, with the internet, reality TV, and politics arguably rewarding what would have been considered socially unacceptable forms of speech just a few decades ago. Arguably, our society does not teach the idea that "there are some things you do not say" as well as it used to.

Second, veterans of the military may have a somewhat higher rate of psychiatric issues than members of the public in general. This is not surprising. One, military personnel necessarily go through intense experiences. In wartime, soldiers experience some of the most traumatic experiences that human beings can endure. Even for military personnel who do not see combat, the armed forces put recruits through training that is designed to condition them to the stress of war. Moreover, the armed forces typically start with relatively unformed teenagers, and teach young people how to do things that would be unacceptable in any other context in life (i.e.,

---

[2] True threats are not protected by the First Amendment, but they are a fairly narrow exception to the presumption of free speech. See *Counterman v. Colorado*, 600 U.S. 66, 72-74 (2023); see also *United States v. Watts*, 394 U.S. 705 (1969) (statements of political hyperbole are not considered "true threats"). No argument is being made here that Mr. Stiso's statements here are protected by the First Amendment.

8

killing). The fact that we have had a volunteer army since 1973 also means that the pool of military trainees army tends towards people who do not otherwise have a plan. Therefore, it is not surprising that, after extensive training in effective killing techniques, adjustment to civilian life can be challenging.

With all this in mind, it is not surprising that sometimes veterans make threats. This does not make it ok. It simply explains, in part, why it happens. All people, including veterans, remain accountable for their actions. In an ideal world, veterans who were feeling overwhelmed by emotional or psychological issues would have a service they could call up before things got too far out of hand. Some sort of mental health crisis hotline would be a very good thing. Such a hotline does exist: the Veteran's Crisis Line. Arguably, the VA Crisis Line functioned exactly the way it should have, and did at least some of what it should have. Mr. Stiso made the threats alleged. That is not good. But he did so on recorded calls to people trained to handle crisis calls. The result was that law enforcement was notified, and Mr. Stiso was initially put into a psychiatric ward for treatment. PSR at 6. If these calls are treated as cries for help, which they were both in that is what Mr. Stiso said was the reason why he was calling, and because every call to the VA Crisis Line is by definition a call for help, they arguably worked, although not in a way that Mr. Stiso might have hoped for.

Admittedly, this does not make Mr. Stiso's conduct acceptable. It's not. But there are several ways in which Mr. Stiso's conduct is not as egregious as a lot of conduct that would fall under the same statutes and guidelines. Threats harm their victims in that the victims feel fear, and that is typically the point of the conduct. That fear is magnified when threats are made anonymously. By calling up the VA Crisis Line instead of calling the people he was upset with, and by giving his full name and identifying information, some lesser degree of fear may have been created by Mr. Stiso's actions. This does not excuse what he did, but it separates Mr. Stiso's conduct from arguably more terrifying conduct like what occurred in *Counterman v. Colorado,* where a victim was stalked for years by someone sending messages suggesting that he was surveilling the victim in real life, but where the victim did not know her stalker, and where the defendant kept creating new Facebook accounts to continue his conduct. 600 U.S. 66, 70 (2023).

But the biggest mitigating characteristic of Mr. Stiso's conduct is that these were quite literally calls for help. As mentioned a few times above, Mr. Stiso was not calling the people he was threatening. He was calling the crisis line at an agency that he hoped would help veterans in crisis. These calls were both threats and requests for help. Neither aspect should be ignored.

## C.     Observations about Mr. Stiso.

As discussed above, Nicolas Stiso has had problems for years. Arguably, his mental health issues go back to childhood. See PSR at 15-16. He seems to have difficulty navigating social interactions in particular. His difficulties continued in the military, which he joined at age 18. His frustration with those social difficulties compounds the challenges he faces. His criminal history seems inextricably tied to his mental health issues; there is not much in it that is explained by more typical criminal motivations.[3]

In particular, 2023 was not a good year for Mr. Stiso. On top of his mental health and grief issues, Mr. Stiso was using controlled substances, particularly methamphetamine. Although this may have been an attempt at self-medication, as a treatment for his problems it failed spectacularly. Things got worse, not better.

Mr. Stiso has now been completely clean and sober for almost nine months, since the day of his arrest in late December of 2023. Counsel would like to say that, clean and sober, Mr. Stiso is fine. Unfortunately, it wouldn't be true. There is no doubt that a clean and sober Nicolas Stiso is far more capable of conforming his conduct to the laws and norms of society than the meth-addled version of himself. Nevertheless, Mr. Stiso still has issues. Despite the situation he is in, he still struggles

---

[3] In other words, people typically steal, commit fraud, or sell drugs to get money. Those are crimes, but not necessarily irrational. People do need money. In contrast, there is nothing in Mr. Stiso's criminal history that looks particularly rational.

with grief, anger, and mental illness. He is doing better, but he is not perfect. Counsel and Mr. Stiso have been talking about what he needs to work on, and how he can avoid problems in the future. Some of those topics are addressed in a letter Mr. Stiso has written to the Court, which will be submitted separately.

Defense counsel has not had Mr. Stiso evaluated. That will remain a project for supervised release. But one observation that counsel would make would be that Mr. Stiso does not have much of a filter. He is generally a nice man, but to the extent that he experiences negative emotions, he does not quite understand the idea of verbal restraint. Also, he is much more a danger to himself than to anyone else.

This is not going to be an easy supervision case. Mr. Stiso still has mental health issues. Additionally, he will be starting over again with respect to housing and employment. His parents are pleased with the progress he is making, but they are (understandably) not willing to take him into their home again. Mr. Stiso needs to find stability on his own, and repairing his relationship with his parents is a goal, not a starting point. It will be the defense's suggestion, no matter what the guidelines range is, that an appropriate sentence in this case might be 14 months, but with the caveat that a condition of supervised release should require him to spend up to 120 days at the Salvation Army halfway house. That way, the goal of re-obtaining housing (possibly through the VA, or not) could be addressed with some flexibility. Timing his release to correspond exactly to the date he has a bed available would be

very difficult. If he is starting from the Salvation Army, and if he is there as a condition of supervised release (as opposed to there as part of a BOP sentence), then the probation office can effectively be given control as to his release date.

### III. The proposed conditions of supervised release are acceptable.

The proposed conditions of supervised release seem sensibly tailored to allow the Probation Office to monitor Mr. Stiso's behavior. In particular, the recommendations for both mental health and substance abuse treatment seem well advised. The defense has no objections to the proposed conditions of release, but as discussed above, suggests that an initial placement at the Salvation Army for a period of up to 120 days at the discretion of the probation office would make sense in this case.

### Conclusion

This case is serious. The defense is not arguing otherwise. However, a sentence of 14 months' custody, in conjunction with the conditions proposed, would impose a substantial penalty for Mr. Stiso's conduct. That would accomplish the goals of deterrence and punishment. At the same time, any punishment imposed in this case should keep in mind that Mr. Stiso does have a reduced ability to conform his conduct to the law. The interests of rehabilitation do not require a lengthy sentence here. It is hoped that the proposed sentence achieves a balance between these various §3553 considerations.

For all these reasons discussed above, it is respectfully suggested that a sentence of 14 months custody, to be followed by three years of supervised release with appropriate conditions (including an initial placement at a halfway house), would be sufficient in this case.

>	Respectfully submitted,
>
>	FEDERAL DEFENDER PROGRAM
>	John F. Murphy
>	Executive Director
>
>	By: *s/ Daniel J. Hesler*
>	    Daniel J. Hesler

DANIEL J. HESLER
FEDERAL DEFENDER PROGRAM
55 E. Monroe St., Suite 2800
Chicago, IL 60603
(312) 621-8347

# **CERTIFICATE OF SERVICE**

The undersigned, Daniel Hesler, an attorney with the Federal Defender Program hereby certifies that in accordance with FED.R.CIV.P5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following document(s):

**DEFENDANT STISO'S SENTENCING MEMORANDUM**

was served pursuant to the district court's ECF system as to ECF filings, if any, and were sent by first-class mail/hand delivery on October 9, 2024, to counsel/parties that are non-ECF filers.

By:   */s/ Daniel J. Hesler*
      DANIEL J. HESLER
      FEDERAL DEFENDER PROGRAM
      55 E. Monroe St., Suite 2800
      Chicago, Illinois 60603
      (312) 621-8347